UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EFT Services LLC, and IPN LLC d/b/a Paybotic,<br><br>      Plaintiffs,<br><br>    v.<br><br>i-POS Systems LLC d/b/a Dejavoo, and DeNovo Systems, LLC,<br><br>      Defendants. | Civil Action No._____<br><br>**COMPLAINT** |

Plaintiffs EFT Services LLC ("EFT") and IPN LLC d/b/a Paybotic ("Paybotic," and with EFT, "Plaintiffs"), by and through their undersigned counsel, as and for their Verified Complaint against Defendants i-POS Systems, LLC d/b/a Dejavoo ("Dejavoo") and DeNovo Systems, LLC ("DeNovo," and with Dejavoo, "Defendants") herein allege as follows:

## NATURE OF THE ACTION

This dispute arises from an unsatisfied licensor's efforts to bully its licensees out of the non-exclusive, ***perpetual*** software licenses to which the parties agreed because the licensor has purported to have sold a single ***exclusive*** license to a third party for a lot more money. The defendant licensor has told the plaintiff licensees that it has unilaterally terminated their licenses and will cut off plaintiffs' access to the licensed software on March 1, 2020. On March 26, 2020, the day before plaintiffs commenced this action and filed this Motion, plaintiffs learned that defendants would take steps to commence this process on February 28, 2020.

Because the plaintiff licensees operate niche businesses, the licensed software is a unique product for which no substitute exists. It is an essential part of the licensee's businesses. The licensees' are electronic payment processors who use the software to run terminals operated by the licensees' customers that enable holders of credit and debit cards to get cash through a

specific type of transaction at specific types of retail locations. The licensees electronically process those transactions in return for fees. The transactions cannot be done without the software.

The unsatisfied defendant licensor has already crippled the licensees' niche businesses by (i) cutting off their access to the parts of the software that allow them to provide technical support to their customers and the retail merchants in whose establishments the terminals are located, leaving their customers and merchants stranded with hundreds of inoperable terminals that the licensees are powerless to fix, and (ii) blocking the licensees' customers from adding new merchant customers, thereby cutting off any growth in their customers' and, in turn, the licensees' businesses. The licensor's actions have already caused the licensees to lose business and has been devastating to the licensees' reputations and good will.

Defendants have told the plaintiffs that they will cut off the software and shut down the terminals on March 1, 2020. Plaintiffs have sought injunctive relief because if defendants are not restrained from doing so, plaintiffs' customers will have no choice but abandon plaintiffs and instead seek new licenses from the third party to whom defendants claim they have sold an exclusive license. This will effectively shut plaintiffs out of their niche market, and irreversibly and completely obliterate their reputations and good will.

Further, if defendants shut down plaintiffs' niche businesses at this time, plaintiffs will miss out on what can only be described as a "boom period" in their niche market, which is rapidly expanding due to recent and continuing changes in the legal regime governing that market. Because it is impossible to predict with any accuracy what further changes might occur to the fast-changing legal regime, it is difficult to predict how fast and how far plaintiffs' niche

market will expand. If defendants are not restrained plaintiffs will effectively be shut out of this boom period and, instead, wiped out.

## THE PARTIES

1. Plaintiff EFT is a Florida limited liability company with its principal place of business at 4801 S. University Drive, #303, Davie, Florida 33328.

2. Plaintiff Paybotic is a Florida limited liability company with its principal place of business at 120 S. Dixie Highway, West Palm Beach, Florida 33401.

3. On information and belief, Defendant Dejavoo is a Delaware limited liability company with its principal place of business at 393 Jericho Turnpike, Suite 203, Mineola, New York 11501.

4. On information and belief, Defendant DeNovo is a Puerto Rico limited liability company with its principal place of business at 393 Jericho Turnpike, Suite 203, Mineola, New York 11501. On information and belief. Dejavoo and DeNovo are owned and controlled by the same person and operate as a single business. Accordingly, for simplicity all references to Dejavoo shall refer to Dejavoo and DeNovo collectively.

## JURISDICTION AND VENUE

5. The Court's jurisdiction over this dispute is based on the parties' diversity of citizenship under 28 U.S.C. § 1332(a)(1) because it is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

6. This Court has jurisdiction over Defendants Dejavoo and DeNovo because, on information and belief, their principal places of business are in the State of New York. Further, each of EFT, Paybotic, Dejavoo, and DeNovo has signed a contract that is the subject of this action, which provides that "EACH PARTY CONSENTS AND SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION TO THE STATE AND FEDERAL COURTS LOCATED

IN NEW YORK, NEW YORK FOR ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY."

## FACTS

### A. EFT is a Family Business and Industry Pioneer

7. EFT is a family business started by Randy Nolte in 2001. Randy is 100% owner of EFT, which he runs with his daughter Liz and son Ryan.

8. EFT is an electronic payment processor for point of sale ("POS") transactions through which a cardholder uses a credit or debit card to obtain cash by (i) inserting a credit or debit card into a card reading device, or "terminal," located at a retail merchant, (ii) entering a PIN on a keypad, (iii) receiving a receipt for the desired amount of money, and (iv) presenting that receipt to the merchant who dispenses cash to the cardholder. The cardholder may use some or all the cash to buy goods and/or services from the merchant.

9. EFT's direct customers are "Independent Sales Organizations" or "ISOs" that purchase POS terminals from a manufacturer and then transacts with retail merchants to place those terminals in the merchants' places of business. EFT provides its ISO customers with the specialized software needed to operate that manufacturer's POS terminals, provides technical support to the ISOs, and processes cardholder transactions performed on terminals using that software. EFT receives a fee for processing those transactions.

10. In 2014, EFT pioneered the introduction of POS transaction services to state licensed cannabis dispensaries ("SLCDs"). Recent changes in state laws have resulted in a dramatic expansion of the SLCD market and, with it, the demand for POS transaction services by SLCD merchants.

### B. EFT Migrates its SLCD Business to a Custom Software Application Developed and Licensed by Defendant Dejavoo

11. By 2019, EFT had determined that the software application it had been using for its SLCD business could no longer support its continuing expansion.

12. Defendant Dejavoo is a POS software developer and manufacturer of POS terminals. In January 2019, Jennifer Gonzales ("Gonzales"), who had previously worked as sales manager at EFT's then-current software and terminal provider, contacted EFT to introduce EFT to Dejavoo, where she had been recently hired as West Coast Sales Manager.

13. Thereafter, EFT and Dejavoo negotiated and executed a 5-page Services and License Agreement dated as of March 11, 2019 (the "EFT Perpetual License").[1] Pursuant to the EFT Perpetual License, Dejavoo agreed to work with EFT to create a unique, customized software application designed to support EFT's SLCD business (the "SLCD Application"). The parties agreed that the SLCD Application would operate only on terminals purchased from Dejavoo. The SLCD Application would, among other things, handle such tasks as (i) reading the information from credit and debit cards inserted into a Dejavoo Terminal; (ii) directing cardholder transactions to EFT for processing, and (iii) distributing the fees associated with the transaction.

14. In addition, the SLCD Application would allow EFT's ISO customers add new SLCD merchant accounts, and would allow EFT to provide technical support to its ISO customers.

15. Pursuant to the EFT Perpetual License, Dejavoo granted EFT "a limited, non-exclusive, non-transferable, with the limited right to sublicense to users of the Dejavoo

---

[1] A copy of the EFT Perpetual License is attached as Exhibit 1 to the Declaration of Randy Nolte, executed February 27, 2020 ("Randy Decl.").

Terminals, license to use the Technology [i.e., the SLCD Application] *solely with the Dejavoo Terminals as an integrated product*" and specified that "[p]rovided that [EFT] is at all times in full compliance with the terms of this Agreement, *the license granted herein is perpetual.*" (EFT Perpetual License ("PL") § 3 (emphasis added).)

16. The SLCD Application is unique and there is currently no existing software application that can replace it. Nevertheless, in reliance on the EFT Perpetual License, EFT migrated its SLCD business to the SLCD Application. Because the SLCD Application could be run only on Dejavoo Terminals, EFT's ISO customers were required to purchase approximately 1,900 new Dejavoo Terminals at an expense of more than $350,000. *EFT's ISO customers made those purchases in reliance on EFT's continuing ability to provide the software necessary to operate those terminals*.

17. Although the SLCD Business is expanding rapidly, a current snapshot shows that at least 1,230 Dejavoo Terminals operated by more than 380 merchants in 35 states and the District of Columbia depend on the SLCD Application provided under the EFT Perpetual License to continue providing POS payment services to cardholders. Again, although these numbers are changing quickly, a current snapshot indicates that in recent months cardholders have conducted about 220,000 transactions per month through these terminals.

C.   **Paybotic Enters Into a Separate Perpetual License**

18. In November 2019, one of EFT's ISO customers, Plaintiff Paybotic, entered into a separate agreement (the "Paybotic Perpetual License," and with the EFT Perpetual License, the "Perpetual Licenses")[2], with terms virtually identical to those in the EFT Perpetual License. The

---

[2] A copy of the Paybotic Perpetual License is attached as Exhibit 1 to the Declaration of Max Miller, executed February 27, 2020 ("M. Miller Decl.").

Paybotic Perpetual License would enable Paybotic to build its own network of ISO customers for whom it could process transactions independently of EFT.

19. Pursuant to the Paybotic Perpetual License, Dejavoo granted Paybotic "a limited, non-exclusive, non-transferable, with the limited right to sublicense to users of the [Dejavoo] Terminals, license to use the Technology [i.e., the SLCD Application] *solely with the [Dejavoo] Terminals as an integrated product*" and specified that "[p]rovided that [Paybotic] is at all times in full compliance with the terms of this Agreement, the license granted herein is perpetual." (Paybotic Perpetual License ("PL") § 3.)

20. As discussed above, the SLCD Application is unique and there is currently no existing software application that can replace it. Nevertheless, in reliance on the Paybotic Perpetual License, Paybotic committed to using the application to build its ISO customer base. Because the SLCD Application could be run only on Dejavoo Terminals, Paybotic's ISO customers have been required to purchase approximately 1,900 new Dejavoo Terminals at an expense of more than $400,000. Paybotic's ISO customers made those purchases in reliance on Paybotic's continuing ability to provide the software necessary to operate those terminals.

21. Although the SLCD Business is expanding rapidly, a current snapshot shows that more than 2,700 Dejavoo Terminals operated by more than 426 merchants in 35 states and the District of Columbia depend on the SLCD Application supplied under the Paybotic Perpetual License to continue providing POS payment services to cardholders. Again, although these numbers are changing quickly, a current snapshot indicates that in recent months cardholders have conducted about 300,000 transactions per month through these terminals.

D. **Dejavoo Tries to Bully EFT and Paybotic Out of the Perpetual Licenses**

22. On a telephone call on January 9, 2020, Gonzales advised Liz and Randy Nolte that Dejavoo was, without explanation, purporting to terminate the EFT Perpetual License. Later

that day Gonzales emailed a proposed new agreement, which replaced the perpetual license provision in the EFT Perpetual License with a provision permitting Dejavoo to terminate EFT's license at will with 72 hours' notice (the "Terminable License").

23.     On or about January 21, 2020, Gonzales advised Max Miller ("Miller"), Paybotic's President and CEO and Eveline Dang ("Dang"), Paybotic's Vice President, that Dejavoo was, without explanation, purporting to terminate the Paybotic Perpetual License. Later that day Gonzales emailed a copy of the Terminable License, which replaced the perpetual license provision in the Paybotic Perpetual License with a provision permitting Dejavoo to terminate Paybotic's license at will with 72 hours' notice.

24.     EFT and Paybotic refused to sign the Terminable License.

25.     On or about February 3, 2020, Christopher Clarke ("Clarke"), Dejavoo's Corporate Sales Manager, advised EFT and Paybotic that Dejavoo, without any advance notice would immediately be "pushing" substantial changes in its software operating systems that would likely require significant adjustments to the SLCD Application to avoid operating problems and potential shut downs. Both EFT and Paybotic objected to the immediate software push on the grounds that it would take them at least 30 days to make the necessary adjustments to ensure that the Dejavoo Terminals they supported would remain operable. Clarke gave both a few more days, which was not nearly enough time to prepare for the software push.

26.     On February 2, 2020, Mony Zenou, CEO of Dejavoo ("Zenou"), emailed Miller and Dang that "[t]he software push we are doing this week will be in correlation with the new contract [i.e., the Terminable License]. It's advisable to sign it." Zenou threatened that "[a]s of March 1st, we will no longer accept any [of the Dejavoo Terminals supported by Paybotic] on our systems," and that "should you elect to reject the revised contract, we will no longer be able

to accept any new orders from you or board any new merchants on our system, even in the transition period [prior to March 1st]." On or about the same day, Zenou issued the same threat to EFT verbally. In practical terms, Zenou's threats meant that, among other things, neither Paybotic nor EFT, nor any of their ISO customers, could add new merchant customers or provide merchant customers with technical support.

27. On February 7, 2020, Dang advised Clarke that one of Paybotic's ISOs had reported that some its merchants had reported that Dejavoo's software push had left their Dejavoo Terminals inoperable. Dang reminded Clarke that Paybotic's ISO customer could not help its merchant customer because Dejavoo had cut off access to technical service. Accordingly, Dang asked Clarke, "would you be able to enable technical service steam access for [the ISO customer] so that they can better support their customers whose all [Dejavoo Terminals] were down after losing the TID in the [Dejavoo Terminals]. I would really appreciate it."

28. Clarke responded, "we will do this now, until the issues are resolved. Lets [sic] hope by Monday, *then we will shut everyone back off*."

29. On Thursday, February 13, 2020, Clarke emailed Ryan Nolte "A little reminder about signing the agreement [i.e., the Terminable License]. We were hoping to have it back this week. *I will continue to allow access to the portal [i.e., the SLCD Application] until end of business on Friday[, February 14, 2020]*." (emphasis added.)

30. On February 17, 2020, Dang emailed Clarke, "Hi Chris, We have several merchants that need updating the fees and some other parameters on their [Dejavoo Terminals]. Not being able to edit the [Dejavoo Terminals] is causing some of our merchants to temporarily stop processing, and its interrupting both theirs and our business." Accordingly, Dang requested

that Clarke "Please grant us Steam access immediately so that we can resume supporting our merchants as usual. Best Regards, Eveline."

31. Clarke responded "Eveline, as per Mony [Zenou], until Max returns the signed [Terminable] agreement, AND Mony [Zenou] returns it back to Max signed as well, I cannot...."

E. **Dejavoo's Reason for Bullying EFT Becomes Clear: More Money**

32. During a meeting on February 12, 2020, Michael Shvartsman ("Shvartsman"), owner of POS transaction processor, One Pay Cloud LLC ("OPC"), advised Ryan Nolte that Dejavoo had purported to sell OPC an exclusive license to the SLCD Application for a "seven figure" price. Dejavoo later confirmed Shvartsman's representation.

33. On a telephone call on February 19, 2020, and then on near-daily calls to Ryan Nolte ever since, Shvartsman has repeatedly told Ryan Nolte that Dejavoo's sale to OPC of an exclusive license for the SLCD Application terminated EFT's Perpetual License, and, accordingly EFT would only be permitted access to the SLCD Application if EFT signed a new, 11-page "standard agreement" with OPC by March 1, 2020. Shvartsman provided Ryan Nolte with a copy of OPC's standard agreement, which imposed numerous new fees and conditions on the use of the SLCD Application, including onerous "Non-Solicitation; Non-Circumvention; Exclusivity," "Confidentiality," and "Term and Termination" provisions.

34. At the same time as Shvartsman was calling Ryan Nolte, he was also calling Max Miller and Eveline Dang of Paybotic making the same representations and demanding that Paybotic also sign OPC's standard agreement.

35. In effect Shvartsman claimed that Dejavoo's sale to OPC of an exclusive license gave him a monopoly over the SLCD Application, and thus, over the SLCD market empowering him to shut EFT and Paybotic out of the market EFT had pioneered.

36. To drive home the point that Dejavoo had cut Paybotic off from any technical support, on February 21, 2020, Clarke sent Miller and Dang the following email: "Paybotic, do not send my team any requests to make changes to your files."

37. In repeated telephone conversations with EFT and Paybotic since Clarke's email to Paybotic on February 21, 2020, Zenou and Clarke have continuously threatened that on March 1, 2020, Dejavoo will cut off access to the software for both licensees, all of their ISO customers' and all of their ISO customers, merchant customers if they do not sign the Terminable Agreement. That action will squeeze both EFT and Paybotic out of the SLCD market that EFT pioneered, thereby handing OPC a virtual monopoly.

38. Simply put, without access to the SLCD Application, which EFT helped to develop, EFT and Paybotic will lose their ISO customers and the fees for processing cardholder transactions for the ISO customers' merchant customers. Further EFT and Paybotic will be shut out of the rapidly expanding SLCD market, destroying EFT and Paybotic by depriving them of the essential service required to operate their businesses while leaving hundreds of merchants with nearly 2000 useless Dejavoo Terminals and no alternative to provide POS transaction services to their customers.

**F.   Dejavoo Assists OPC in Soliciting EFT's ISO Clients**

39. To date, OPC has solicited at least nine to 10 of EFT and Paybotic's largest ISO customers whose merchant customers rely on the Perpetual Licenses to operate Dejavoo Terminals in their stores. Dejavoo has assisted OPC in soliciting the ISO customers by confirming to them that EFT and Paybotic's Perpetual Licenses have been terminated and that they are no longer able to support their merchant customers.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment – The Perpetual Licenses)

40. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 40 hereof as if fully set forth herein.

41. Plaintiffs asserts that the Perpetual Licenses remain in full force and effect.

42. Dejavoo asserts that it has terminated the Perpetual Licenses.

43. An actual present and justiciable controversy has arisen between the parties concerning whether the Perpetual Licenses remain in full force and effect.

44. EFT seeks a declaratory judgment that the Perpetual Licenses remain in full force and effect.

45. Although the value of such a declaration is difficult to determine, it is in no event less than the $75,000 jurisdictional threshold.

## SECOND CAUSE OF ACTION

### (Declaratory Judgment – The Purported OPC License)

46. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 46 hereof as if fully set forth herein.

47. Dejavoo asserts that it has granted OPC an exclusive license to the SLCD Application that terminates the Perpetual Licenses.

48. Plaintiffs asserts that the Perpetual Licenses remain in full force and effect because Dejavoo did not have exclusive rights in the SLCD Application to sell to OPC because Dejavoo had previously sold Plaintiffs perpetual, non-exclusive rights in that same software.

49. An actual present and justiciable controversy has arisen between the parties concerning whether any grant of a license to OPC could terminate the Perpetual Licenses.

50. EFT seeks a declaratory judgment that any grant of a license from Dejavoo to OPC could not terminate Plaintiffs' preexisting Perpetual Licenses and thus, that Plaintiffs' Perpetual License remain in full force and effect.

51. Although the value of such a declaration is difficult to determine, it is in no event less than the $75,000 jurisdictional threshold.

## THIRD CAUSE OF ACTION

### (Breach of Contract)

52. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 52 hereof as if fully set forth herein.

53. The Perpetual Licenses constitute valid and binding agreements between Plaintiffs and Dejavoo.

54. Plaintiffs have performed all their material obligations under the Perpetual Licenses.

55. Dejavoo has breached Sections 3 and 9 of the Perpetual Licenses by purporting to terminate the Perpetual Licenses without (i) identifying any breach by either Plaintiff of the Perpetual Licenses, or (ii) providing written notice to either Plaintiffs of any such breach.

56. By breaching the Perpetual License, Dejavoo has damaged Plaintiffs in an amount to be determined at trial, but in no event less than the jurisdictional threshold of $75,000.

## FOURTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)

57. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs 1 through 57 hereof as if fully set forth herein.

58. Dejavoo has a duty of good faith and fair dealing that arises out of the Perpetual Licenses, which obligates it, among other things, not to purport to grant any third party an

exclusive license terminating the Perpetual Licenses, or to assist any such third party in soliciting Plaintiffs' ISO customers by representing falsely to those customers that Dejavoo has granted any third party such a license that terminates the Perpetual Licenses.

59. By reason of the conduct set forth above, Dejavoo has breached its duty of good faith and fair dealing to Plaintiffs. Among other things, Dejavoo has breached its duty of good faith and fair dealing by intentionally purporting to grant OPC a purported exclusive license in the SLCD Application and assisting OPC to solicit EFT's ISO customers by representing to those customers that Dejavoo has granted OPC such a license that terminates EFT's Perpetual License.

60. By breaching its covenant of good faith and fair dealing, Dejavoo has damaged Plaintiffs in an amount to be determined at trial, but in no event less than the jurisdictional threshold of $75,000.

61. Dejavoo's conduct was willful, malicious, and done with the intent to harm Plaintiffs such that punitive and/or exemplary damages should be awarded.

**WHEREFORE**, Plaintiffs demand judgment against Dejavoo as follows:

(i) For injunctive relief in the form of an order temporarily, preliminarily, and/or permanently (a) Prohibiting Dejavoo from taking or permitting to be taken any action that would in any way interfere with Plaintiffs obtaining the full benefit of the Perpetual Licenses, including but not limited to interfering in any way with the full use of the SLCD Application by any person having access to that application through either Perpetual License as of the date this Order, including but not limited to (1) placing any restrictions on any feature of the SLCD Application, (2)

pushing out system changes in such a manner as to disable EFT and/or Paybotic Terminals, and/or (3) making changes to individual terminal software files without EFT's and/or Paybotic's permission, as applicable; and (b) Directing Dejavoo and its affiliates to immediately restore all functions of which Plaintiffs have been deprived, including but not limited to (1) Steam administrative access, (2) full technical customer support (phone and email), and (3) access to SPIN requests for ISO and ISV (independent software vendors) to enable Paybotic's ISOs and ISV partners to integrate their software with Dejavoo terminals;

(ii) Prohibiting Dejavoo from representing to any person in any manner that either Perpetual License is no longer in full force and effect; and

(iii) Prohibiting Dejavoo from representing to any person in any manner that Dejavoo has granted One Payment Cloud, LLC ("OPC") or any other third party an exclusive license to the SLCD Application.

(iv) For declaratory relief in the form of an order declaring that the Perpetual Licenses remain in full force and effect;

(v) For declaratory relief in the form of an order declaring that any purported sale by Dejavoo of a license to the SLCD Application to OPC or any other third party is without affect to the existing Perpetual Licenses previously granted to plaintiffs;

(vii) For damages in an amount to be determined at trial; and

(viii) For such other and further relief as this Court deems just and proper.

Dated: New York, New York
February 27, 2020

**TARTER KRINSKY & DROGIN LLP**
Attorneys for Plaintiffs

By: _____
Charles M. Miller
Richard C. Schoenstein
1350 Broadway
New York, New York 10018
(212) 216-8000
cmiller@tarterkrinsky.com
rschoenstein@tarterkrinsky.com

## VERIFICATION

STATE OF FLORIA      )
                     )ss:
COUNTY OF BROWARD    )

Randy Nolte, being duly sworn, states under penalty of perjury:

I am the sole owner of EFT Services LLC ("EFT"), one of the plaintiffs in the above-captioned action. I have read the foregoing Verified Complaint, know the contents thereof and the same concerning EFT are true to my knowledge, except those matters that are alleged on information and belief. As to those matters alleged on information and belief, I believe them to be true based upon my inspection of books and records maintained by EFT, which are in my custody and control, publicly available information, my familiarity with the parties involved and/or my experiences in, and knowledge of, the point-of-sale transaction business.

Randy Nolte

Sworn to before me this
27th day of February 2020

NOTARY PUBLIC



Notary Public State of Florida
Candace Effron
My Commission GG 929705
Expires 11/06/2023

## VERIFICATION

STATE OF FLORIA    )
                   )ss:
COUNTY OF WEST PALM )

Max Miller, being duly sworn, states under penalty of perjury:

I am President and CEO of Plaintiff IPN LLC d/b/a Paybotic ("Paybotic"), one of the plaintiffs in the above-captioned action. I have read the foregoing Verified Complaint, know the contents thereof and the same concerning Paybotic are true to my knowledge, except those matters that are alleged on information and belief. As to those matters alleged on information and belief, I believe them to be true based upon my inspection of books and records maintained by Paybotic, which are in my custody and control, publicly available information, my familiarity with the parties involved and/or my experiences in, and knowledge of, the point-of-sale transaction business.

_____
Max Miller

Sworn to before me this
27 day of February 2020

_____
NOTARY PUBLIC

HYUN MIN L CASH
Notary Public - State of Florida
Commission # GG 913788
My Comm. Expires Nov 5, 2023